IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE FUNERAL CONSUMERS

Antitrust Litigation.

_____/

No. C 05-01804 WHA

Consolidated cases:
No. C 05-02501 WHA
No. C 05-02502 WHA
No. C 05-02792 WHA
No. C 05-03124 WHA
No. C 05-03305 WHA

Related case:
No. C 05-02806 WHA

**ORDER GRANTING MOTION TO TRANSFER**

**INTRODUCTION**

In these antitrust cases, defendants jointly have moved under 28 U.S.C. 1404(a) to transfer venue to the Southern District of Texas. Defendants have carried their burden of proving that the convenience of parties and witnesses, and the interest of justice, would clearly and substantially be improved by such a transfer. The motion is therefore **GRANTED.**

**STATEMENT**

The complaint in the first of these cases was filed May 2, 2005. Certain plaintiffs, a consumers group and individual consumers, purchased caskets and other funeral-industry products and services. Another plaintiff, Pioneer Valley Casket Co, Inc., is an independent, low-cost casket seller. Defendants are funeral-home chains, a casket manufacturer and its parent company. Plaintiffs accuse defendants of violating Sections 1 and 2 of the Sherman Act, 15

U.S.C. 1–2, and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–210. The consumers group, Funeral Consumers Alliance, Inc., and the individual consumers, sue on behalf of a putative nationwide class of consumers who bought Batesville caskets from the funeral-home co-defendants, Service Corporation International (SCI), Alderwoods Group, Inc., and Stewart Enterprises, Inc. Pioneer Valley sues on behalf of a putative nationwide class of independent casket retailers. Specifically, plaintiffs claim defendants

- conspired through a group boycott to prevent independent casket retailers from selling caskets marketed under the Batesville brand and others,
- engaged in a campaign of disparagement against independent casket retailers and their wares, and
- jointly worked to restrict casket price competition and to coordinate casket pricing by restricting or preventing price advertising, sharing price information and promoting "sham" discounting.

On August 2, 2005, defendants jointly moved under 28 U.S.C. 1404(a) to transfer these cases (collectively, "In re Funeral Consumers Antitrust Litigation") to the Southern District of Texas. This motion applies to the following of cases, described here by plaintiff name and case number: *FCA* (No. C 05-01804 WHA), *Rocha* (No. C 05-02501 WHA), *Berger*, (No. C 05-02502 WHA), *Magsarili* (No. C 05-02792 WHA), and *Pioneer Valley* (No. C 05-02806 WHA).

**ANALYSIS**

**1. VENUE TRANSFER RULES.**

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. 1404(a). The section's purpose is "to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotation marks omitted). A district court has discretion "to adjudicate motions for transfer according to an individualized,

2

case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (citation omitted). A court must "balance the preference accorded plaintiff's choice of forum with the burden of litigating in an inconvenient forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir.1986).

In weighing each case, a court also should consider:

> (1) the relative ease of access to sources of proof, (2) availability of compulsory process for attendance of unwilling witnesses, (3) the cost of obtaining attendance of willing witnesses, (4) the possibility of view of premises, if appropriate to the action, (5) all other issues related to making a trial easy, expeditious and inexpensive, (6) the relative congestion of the two courts, (7) the local interest in having localized controversies decided at home, (8) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action, (9) avoidance of unnecessary problems in conflict of laws, or in the application of foreign law, and (10) the unfairness of burdening citizens in an unrelated forum with jury duty, (11) the location where relevant agreements were negotiated and executed, (12) the respective parties' contacts with the forums, (13) contacts relating to the plaintiff's causes of action in the chosen forum, and (14) the differences in the costs of litigation in the two forums.

*Ibid.*; *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000).

### 2. ACTION COULD HAVE BEEN BROUGHT IN THE SOUTHERN DISTRICT OF TEXAS.

There is no dispute that plaintiffs could have brought this action either here or in the Southern District of Texas. The unfair competition claim could have been brought in any court of competent jurisdiction, although this does not mean the California law reaches extra-territorial conduct. *See* Cal. Bus. & Prof. Code § 17203. Antitrust venue may be laid in any district in which a corporate defendant "may be found or transacts business." 15 U.S.C. 22. That means that large corporations are subject to suit in virtually every corner of the country, given their commonly wide scope of operations these days. Such breadth of operations provokes motions such as the present one to transfer venue under 28 U.S.C. 1404(a).

The Court finds that venue would have been proper in the United States District Court for the Southern District of Texas. It would have had jurisdiction over the federal antitrust actions

3

1  under 28 U.S.C. 1331 and supplemental jurisdiction over the state-law claim under 28 U.S.C.
2  1367.

### 3. BALANCING THE FACTORS: AN OVERVIEW.

No plaintiff resides in this district. Only one of the dozen or so plaintiffs even resides in California. Most reside on the East Coast. All of defendants' principal places of businesses are in Houston or points east. No operative fact is alleged to have occurred in this district. On the other hand, defendant funeral home companies operate 44 funeral homes in this district and 228 in California (as well as many others nationwide). The Rule 26(a) disclosures reveal some witnesses in California. Most, however, reside in Texas or on the other side of the Mississippi River. No district claims a majority of all witnesses, but the Southern District of Texas claims more than any other district.

Section 1404(a) calls out three factors to guide a transfer motion: (i) the convenience of parties, (ii) the convenience of witnesses and (iii) the interest of justice. In volumes, the caselaw has illuminated the meaning of these three factors. This order will concentrate on the caselaw most pertinent to the record at hand.

Under Section 1404(a), a plaintiff's choice of venue is entitled to substantial weight, although this is often said to be less controlling in a purported nationwide class actions, as here. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). At all events, movants must make a clear-cut showing. The issue is not merely whether some other district would better serve the parties and witnesses. The burden is on the moving parties to show that the Section 1404(a) factors would clearly be better served by a transfer.

### 4. PARTY CONVENIENCE.

We may not use a transfer simply to shift the burden of venue from one side to the other. Here, however, no plaintiff resides in this district and only one resides in California. The clear center of gravity of the residences of all plaintiffs is well east of the Mississippi River.

Houston is the principal place of business of the largest of defendant funeral-home company, SCI, and is in the Southern District of Texas. Another defendant funeral-home company is Stewart, headquartered in New Orleans. In the wake of Hurricane Katrina, it has

4

1  temporarily moved its headquarters to Irving, Texas. Alderwoods is the third defendant
2  funeral-home company. It is headquartered in Cincinnati. All three own and operate outlets in
3  this district. Given their nationwide scope, their connections to this district are similar to their
4  connections to districts elsewhere in America. Their executive offices and the representatives
5  supervising the defense, however, are in the cities stated — Houston, New Orleans and
6  Cincinnati.

7  The three funeral-home chains are alleged to have entered into a horizontal conspiracy to
8  stamp out independents who seek to sell low-priced caskets to bereaved families. Plaintiffs
9  claim this forced consumers to pay exorbitant prices for caskets. The three allegedly pressured a
10 prominent manufacturer, defendant Batesville Casket Company, to refuse to do business with the
11 independents, thus cutting off the independents from a source of quality product. Batesville has
12 its headquarters in Batesville, Indiana. The last defendant is Batesville's parent, Hillenbrand
13 Industries, Inc., also located in Batesville.

14 How will the situs of this case affect the burden on the parties? In addition to litigation
15 counsel, corporate representatives can be reasonably expected to attend various hearings and the
16 trial. Given the complexity and scope of the case, more hearings can be expected than in the
17 usual case, not counting mere discovery conferences with the judge that may be manageable by
18 telephone. The trial can surely be expected to last longer than the usual case. All of this means
19 that more days will be spent in court by the parties themselves than in the usual case.

20 A transfer to the Southern District of Texas will drastically reduce the burden on the
21 largest funeral-home defendant, SCI. And, it will significantly reduce the burden on the other
22 defendants as well. The travel times from their locations to the Southern District are all
23 markedly less than the travel times to San Francisco, as the record demonstrates in detail. The
24 same is true for almost all of the plaintiffs. The Southern District seems to present a clear
25 advantage over San Francisco.[1]

---

[1] Plaintiff Funeral Consumers Alliance, Inc., is located in Vermont (and incorporated in Pennsylvania). While it has many members in California, it has a nationwide membership (Compl. ¶ 12). The members, however, are not parties. Their convenience does not matter. The leadership and executive officers of the association are in Vermont and will benefit, cost-wise, by a transfer to Texas.

5

Although a few decisions have given weight to the location of counsel, most have not, saying that it is not to be considered at all or to be given very little weight. Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure*, § 3850 (2d ed. 1986). One reason is that it would be easy to manipulate venue simply by obtaining counsel in the venue of choice. Be that as it may, it is worthwhile to note that the largest team of plaintiffs' counsel in this action is based in New York. Even for plaintiffs' counsel, therefore, the burden would be diminished by a transfer to the Southern District of Texas.[2]

**5. WITNESS CONVENIENCE.**

In assessing a Section 1404(a) transfer motion, the matter of trial witnesses subdivides into two parts: the willing and the unwilling. Willing witnesses are those who can be expected to appear at trial voluntarily, meaning without the necessity of a subpoena. The unwilling are those who can be expected to testify live at trial only if they are within subpoena range of the courthouse.

As for the willing, the convenience-of-witnesses factor looms large. These individuals must take time out of their work and private time to travel to and from the place of trial, to live away from home and to wait around windowless corridors on call to testify. Back home, they have children to get to school, elderly parents to care for, jobs to do and lives to lead — all of which must be managed somehow or put on hold. Although lawyers tend to underestimate this burden, it is genuine, all the more so in a distant city. Even where a witness is an employee of a party and will be paid, the disruption is still a hard fact. The expenses of transportation, housing and meals, even if borne by a party, are nonetheless authentic outlays. *See, e.g.*, *Decker Coal*, 805 F.2d at 843. Among other things, Section 1404(a) prefers a venue where the burden on witnesses will be clearly reduced. *Belzberg*, 834 F.2d at 739.[3]

In order to better appreciate the comparative witness burdens associated with the two districts in question, the Court requested post-hearing supplemental information to include

---

[2] This order agrees with plaintiffs that the availability of modern imaging and copying methods greatly reduces the importance of the location of documents.

[3] In light of *Decker Coal* and the language of the statute itself, this order rejects the notion that inconvenience to *party* witnesses must be ignored or discounted. *See Decker Coal*, 805 F.2d at 843.

6

1  all Rule 26(a) disclosures of potential witnesses, among other things. This was invited so that
2  the prospective witnesses, as disclosed by counsel themselves, could be, in effect, imagined on a
3  map of the United States. These were submitted and reviewed by the Court.
4         The Rule 26(a) disclosures identified a large number of witnesses. Plaintiffs identified
5  69 individuals and organizations likely to have discoverable information that plaintiffs might use
6  to support their claims. One is a resident of this district. A half-dozen live in other parts of
7  California. The overwhelming majority are in Texas or east of the Mississippi River, including
8  present and former employees of defendants. Plaintiffs also listed every state funeral-directors
9  association. Plaintiffs also listed 161 casket retailers throughout the country, six of which are
10 located in this district. Defendants listed 209 individuals throughout the United States, of which
11 one resides in this district and 49 reside in Houston. Overall, the vast majority reside east of the
12 Mississippi River.
13        We all know that the final trial witnesses will be a much smaller subset. In a Sherman
14 Act case, the key liability witnesses (on both sides) are usually present and former officers and
15 employees of the accused. This is because they were the ones at various meetings alleged to be
16 conspiratorial or with pricing and marketing responsibilities. When a nationwide antitrust
17 conspiracy is alleged, the key witnesses usually work (or worked) at a national office or a
18 regional office rather than a local retail outlet. Therefore, the final trial witnesses (on liability)
19 are very likely to be drawn in this case from Houston and east of the Mississippi River, as
20 plaintiffs' own Rule 26 disclosures bear out. The damages witnesses will likely be plaintiffs
21 themselves (and retained experts as yet unknown).
22        Plaintiffs now showcase four California-based witnesses. One is the editor of the
23 *Funeral Monitor*, an industry newspaper published in Monterey. The complaint (¶¶ 63, 68,
24 75–76) quotes from four or so articles therein. It is hard to see, however, how newspaper articles
25 will be admissible at trial. The same is true as to any information possessed by the editor. It will
26 be largely hearsay. As for Mark Blankenship, the record does not show that he resides in
27 California. He may work for a chain with an outlet in Susanville, California, but his residence is
28

7

not shown to be in the state.[4] On the other hand, plaintiffs may well be entitled to call the spokesperson for the California Funeral Directors Association who made the disparaging comment (Compl. ¶ 80). For that California witness to appear in Texas will be more burdensome. The same is true for the president of the association. Against the larger picture of the far greater number of witnesses in Texas, as shown by the Rule 26 disclosures, the California witnesses shrink into insignificance.

### 6. THE INTEREST OF JUSTICE.

Unwilling witnesses present more of an "interest of justice" problem than a "convenience of witnesses" problem. In the conduct of the trial itself, any jury would prefer to see and hear important witnesses in person. In this way, the jury can better assess demeanor and credibility. And, live testimony is easier to follow and comprehend than deposition read-ins or video clips. The difficulty is exacerbated by the fact that depositions are often taken before certain fact issues gather importance. They may, therefore, not fully address points decisive to the jury. Live testimony, therefore, always is to be preferred over deposition excerpts.[5] A problem arises when witnesses are beyond trial subpoena range and they can only be compelled to attend via depositions.

To be sure, a corporate defendant can be expected to arrange for some present and past employees to testify live and voluntarily but only if their testimony will be favorable on balance to the defense. Those with testimony favorable to the *other* side are often unwilling to appear except by deposition unless, of course, they are within subpoena range of the trial court. It would be better to try a case where any such unwilling but important witnesses could be compelled to appear in person. Plaintiffs' counsel may be prepared to proceed via deposition but we should not force a jury to suffer through it where there is a good alternative.

---

[4] In fact, plaintiffs' Rule 26 disclosures show his address as "in care of" a funeral chapel in Carson City, Nevada.

[5] For this reason, this order rejects the argument by plaintiffs that defendants could save money by presenting their defense at trial via depositions.

8

1      At this stage, it is impossible to predict exactly who the unwilling witnesses will be.
2  Experience tells us, however, that they are likely to be present and former employees of
3  defendants. If they have information favorable to the other side, such individuals are usually
4  reluctant to testify against their former and present colleagues unless compelled to do so. So
5  while we do not yet know who precisely will fall into this category, it is reasonably certain that
6  such witnesses will emerge. Houston has the largest single concentration of such potential
7  witnesses. Those witnesses will be subject to trial subpoenas only in the Southern District of
8  Texas.

9      In terms of "local interest," *i.e.*, the connection of the respective districts to the subject of
10 the action, the Southern District of Texas has a larger stake. Both districts, of course, have
11 funeral homes operated by the alleged wrongdoers. Both districts have alleged victims
12 (bereaved families and independent casket retailers) in the putative classes. What distinguishes
13 them is that the largest of the defendant funeral-home chains is based in Houston, not San
14 Francisco. That alone is a substantial connection. Moreover, conspiratorial events, if there were
15 any, were likely to have occurred in Houston. None would have likely occurred in this district
16 (and none is alleged to have occurred here).

17     Turning to another interest-of-justice consideration, plaintiffs argue that our district has
18 less work than the Southern District of Texas and therefore this case could go to trial sooner here
19 than there. The statistics submitted do not bear out this claim. In terms of "weighted" filings per
20 judge, our district shows a heavier caseload per judge over the six-year period of data supplied
21 by plaintiffs' counsel although, for 2003–04 and 2004–05, the Southern District had a slightly
22 heavier load. The median time to trial for civil cases is faster in the Southern District than here.
23 It is true that we have fewer criminal actions here but the majority of the criminal docket in the
24 Southern District, especially in the divisions other than in the Houston division, are § 1326
25 illegal immigration cases, which almost always plead out without much burden on the judge.
26 Overall, it is unfair to claim that the Southern District is not equipped to handle this large civil
27 action as expeditiously as it could be handled here. In this regard, it should be added that
28 counsel on both sides, at the initial case management conference, requested trial dates of

9

1  November 2007 (plaintiffs' choice) and January 2008 (defendants' choice), both very far into the
2  future. This Court required an earlier date in December 2006. The point is that neither side
3  seemed to be in a hurry to go to trial; it is somewhat insincere not to express regret over a
4  possibly longer timetable.

5        The basis for subject-matter jurisdiction is the federal antitrust law. Under the Court's
6  supplemental jurisdiction, however, plaintiffs have alleged a claim under Section 17200 of
7  California's Unfair Competition Law, at least on behalf of the general public in California. It is
8  probably true that judges in this district will be better able to handle this state-law claim than
9  judges in the transferee district. But the tail should not wag the dog. This is first and foremost a
10 purported nationwide antitrust class action under the Sherman Act. The caselaw favoring the
11 district "at home" on the controlling law has arisen in the *diversity* context, not the
12 *federal-question* context. *Decker Coal*, 805 F.2d at 843. If the main *federal* event is clearly
13 better served in the Southern District of Texas than in San Francisco, the pendency of a
14 supplemental state-law claim should not override the indicated result. Moreover, the
15 submissions indicate that federal judges in Texas are familiar with the Texas analogue to
16 California Section 17200. Finally, Pioneer Valley has alleged Texas as well as California state-
17 law antitrust and unfair-competition claims. In any case, this state-law question is a very small
18 factor in the overall balance.

19                         *   *   *

20       In summary, the clear balance of the statutory factors favors transfer. The chief
21 consideration the other way is plaintiffs' choice of forum. Although that choice is normally
22 given substantial weight, the Ninth Circuit has qualified that rule:

23            If the operative facts have not occurred within the forum of
           original selection and that forum has no particular interest in the
24            parties or the subject matter, the plaintiff's choice is entitled only
           to minimal consideration.
25
   *Pacific Car and Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968). That this is brought
26
   as a nationwide class action further dilutes the deference due plaintiffs' choice. *Belzberg*, 834
27
   F.2d at 739. Plaintiffs also argue that 15 U.S.C. 22, the law granting them a wide choice of
28
   venue in antitrust actions, entitles their choice to special deference upon a motion for transfer.

1  This is not the law.  Courts may transfer cases under Section 1404(a) even though they are filed
2  pursuant to 15 U.S.C. 22.  *United States v. Nat'l City Lines*, 337 U.S. 78, 84 (1949).
3  Furthermore, the questions of proper venue and transfer of venue have a different relationship in
4  the instant case than plaintiffs suggest.  *Cf. Ex parte Collett*, 337 U.S. 55, 60 (1949) (holding, in
5  the context of a similar venue statute, 45 U.S.C. 56, that the venue statute and Section 1404(a)
6  "deal with two separate and distinct problems.").  Title 15 U.S.C. 22 makes venue here in this
7  case proper.  Whether to transfer it under Section 1404(a) is, however, another matter.  In this
8  case, movants have carried their burden.

*        *        *

10  After the record was closed on this motion and as this order was being finalized, the
11  Court received a further declaration from counsel for plaintiffs.  It stated that, in about ten days,
12  counsel would be adding a further-named plaintiff resident in this district.  The record shows that
13  the day after the hearing of this motion, plaintiffs' counsel sent out a solicitation letter.  The
14  letter was sent to families who had purchased caskets from funeral homes in the district.
15  Counsel's letter invited them to join the suit as named plaintiffs, advising that "We are seeking a
16  few more individuals to serve as class representatives."  The letter added, "Being a class
17  representative takes very little time, will cost you nothing, and may entitle you to compensation
18  over and above any overcharge you paid for a casket."  Evidently, someone from San Jose has
19  answered the call.

20  The Court has carefully considered whether this potential development would change
21  the outcome on this motion.  The answer is no.  *First*, we will take counsel at his word in his
22  solicitation letter that "being a class representative takes very little time."  If so, the
23  inconvenience to the solicited potential new party will be minimal no matter where venue is laid.
24  *Second*, even adding a new plaintiff to the dozen already on board would not significantly shift
25  the geographic center of gravity of all plaintiffs.  *Third*, the solicitation of a new party after the
26  fact to shore up local contacts for purposes of a pending § 1404 issue smacks of forum-shopping.
27  The caselaw holds that if "there is any indication that plaintiff's choice of forum is the result of
28  forum shopping, plaintiff's choice will be accorded little deference."  *Williams v. Bowman*, 157

11

F. Supp. 2d 1103, 1106 (N.D. Cal. 2001) (Walker, J.); *Italian Colors Restaurant v. American Express Co.*, No. C 03-3719 SI, 2003 WL 22682482 at *3–5 (Nov. 10, 2003 N.D. Cal.) (Illston, J.). *Fourth*, as stated, plaintiffs' choice of forum is accorded less weight where the action is brought, as here, as a class action, all the more so when it is brought as a nationwide class action. *Belzberg*, 843 F.2d at 739.

\*       \*       \*

For the foregoing reasons, the motion to transfer is **GRANTED** in the following cases: *FCA* (No. C 05-01804 WHA), *Rocha* (No. C 05-02501 WHA), *Berger*, (No. C 05-02502 WHA), *Magsarili* (No. C 05-02792 WHA), and *Pioneer Valley* (No. C 05-02806 WHA). The Clerk shall transfer the files to the Clerk for the Southern District of Texas. Meanwhile, the amended complaint and follow-on motions to dismiss should be served on the timetable previously set. When the cases arrive in the Southern District of Texas, the pleadings and motions should be filed with the court. This will avoid any interruption in the prosecution of the cases, all of this, of course, being wholly subject to whatever new schedule will be set by the transferee court.

**IT IS SO ORDERED.**

Dated: September 23, 2005.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE